**BRIAN JACKSON ASSOCIATES, INC.,**
an Arizona corporation, and Melvin
S. Buros, Plaintiffs,

v.

**SAN MANUEL COPPER CORPORA-
TION,** a Delaware corporation, and
Magma Copper Company, a Maine cor-
poration, Defendants.

**Civ. No. 3297.**

United States District Court
D. Arizona.

April 24, 1969.

George E. Reeves, Twitty, Sievwright & Mills, Phoenix, Ariz., Joseph S. Jenckes, Jr., Evans, Kitchel & Jenckes, Phoenix, Ariz., for defendants.

William H. Drummond, Drummond, Cahill & Phillips, Phoenix, Ariz., Evans & Kunz, Phoenix, Ariz., for plaintiffs.

LINDBERG, District Judge.

The court, having heretofore entered findings of fact and conclusions of law following trial with respect to validity and infringement of the patent in suit, makes the following supplemental findings of fact and conclusions of law with respect to subsequent infringement and damages. To establish continuity brief reference to the earlier proceedings is made:

### 1.

The original complaint in this action was filed on December 21, 1959, naming San Manuel Copper Corporation and Kennecott Copper Company as codefendants. Later the actions against San Manuel and Kennecott were severed and the two suits were prosecuted separately.

The suit against Kennecott was tried in the Spring of 1961 before Judge James Walsh of this district, resulting in the entry of findings of fact and conclusions of law on April 27, 1962, holding the Redmond Patent in suit valid but not infringed, and the action was dismissed.

Defendant San Manuel Copper Corporation discontinued doing business on or about April 30, 1962, and was dissolved in accordance with the laws of the State of Delaware, its corporate existence being continued for limited purposes. Thereafter, defendant Magma Copper Company, which assumed the obligations and contingent liabilities of San Manuel Copper Corporation, was joined in the present case as an additional party defendant.

### 2.

The present case first came on for trial of the issues of infringement and validity during March and April, 1965. This court, on July 7, 1966, entered its findings of fact and conclusions of law and memorandum decision, holding the Redmond patent in suit valid and infringed (Brian Jackson Associates, Inc., et al. v. San Manuel Copper Corporation et al., 259 F.Supp. 811 (D.C.Ariz.1966)). The judgment and decree of validity and infringement were entered September 16, 1966, whereupon defendants took and prosecuted an appeal to the Court of Appeals for the Ninth Circuit. The Court of Appeals entered its decision on October 30, 1967, affirming the judgment per curiam and adopting the court's memorandum decision with one clarifying addition (San Manuel Copper Corporation et al. v. Brian Jackson Associates, Inc., et al., 384 F.2d 487 (9 Cir. 1967)).

After the Court of Appeals issued its mandate, supplemental proceedings were necessary to determine the various questions then remaining for resolution by this court. After a pretrial conference held March 4, 1968, the trial of the supplemental issues was held. Evidence was taken during the period May 3 to May 13, 1968, and oral argument was heard on August 8, 1968.

### 3.

The following issues remain for determination by this court prior to the entry of final judgment:

(a) Whether the practices used by defendants since August 26, 1965 infringe the Redmond Patent;

(b) The amount of damages to be assessed against defendants under 35 U.S.C. § 284;

(c) Whether the damages assessed against defendants are to be increased;

(d) Whether plaintiffs shall be awarded their reasonable attorney's fees;

(e) The determination of costs and necessary disbursements which shall be awarded to plaintiffs pursuant to the judgment heretofore entered; and

(f) The amount of interest which shall be assessed against the defendants on the damage award.

### 4.

Defendants admit that after August 26, 1965, they did not revert to the "overblowing process" or "third-vessel process" described by the prior findings. Defendants did not revert to the prior art "blister process" as described in the prior findings and memorandum decision, for they produced copper in the converters of a higher stage of refinement than the blister stage, generally in the flat or peahole stage, without the destructively high temperatures and dangerous, corrosive oxide slag of the overblowing process. As noted in said prior findings of fact and conclusions of law and memorandum decision, this result was not obtained in the prior art on a practical commercial basis. Defendants reverted to the prior art blister process as described in the prior findings on April 18, 1968.

### 5.

By August 26, 1965, the defendants' converter operators had been ordered to stop their previous practice of adding regular converter silica flux during the late stages of the "finish period." Since that time the defendants' converter operators have not added regular silica flux during the late stages of the "finish period" except on isolated unauthorized occasions.

Between August 26, 1965, and September 16, 1966, the defendants added flue dust or aisle cleanings to the converter near the beginning of the finish period, and added flue dust to the converter near the end of the finish.

Between September 17, 1966, and April 18, 1968, the defendants added flue dust and/or aisle cleanings near the beginning of the finish period, but did not add silica-containing materials at later stages.

The silica-bearing flue dust and aisle cleanings were added earlier than the "worm-about-to-disappear" stage mentioned in Claim One of the patent or the stage when the sparks begin to have the appearance of breaking or bursting, mentioned in Claim Three. However, the defendants found it necessary to take additional meaures to keep the contents of the converter cool enough to prevent the silica in the coating over the molten mass from softening during the remainder of the finish blow.

In order to keep the contents of the converter cool beyond the blister stage in the presence of a solid silica-containing blanket during the finish blow, the defendants used processes which had been used at Chuquicamata, Chile, and at the Noranda Smelter in Quebec. The evidence does not establish that these processes had been practiced in this country to keep the contents of a converter cool beyond the blister stage in the presence of a solid silica containing blanket before Redmond reduced his invention to practice, nor that descriptions of the processes as practiced by the defendants had been published anywhere prior to the invention by Redmond.

### 6.

"Flue dust," as the term has been used in this proceeding, means solid materials

which have been carried in to the flue and deposited there by the gasses moving from the converter into the flue.

"Aisle cleanings," as the term has been used in this proceeding, means solid materials which have been deposited on the floors of the aisles around the converters, either through spillage from the converters or from other causes, and which are scraped or cleaned from the aisles.

Both aisle cleanings and flue dust contain uncombined silica, metallic copper, and other materials.

content of the regular converter flux but the defendants added larger quantities of these materials than the quantity of silica flux called for by the Redmond Patent. They added about 6 to 8 tons of flue dust or aisle cleanings. When added in such quantities the flue dust or aisle cleanings would contain about 1380 to 3000 pounds of uncombined silica. For comparison, defendants' regular converter flux, added in the quantities recommended by the Redmond Patent would contain 2100 pounds of uncombined silica.[1]

## 7.

The "aisle cleanings" actually contain regular converter silica flux which falls behind the converter when flux is added from the conveyor belt during the slagging period. A sample of aisle cleanings obtained by plaintiffs on April 8, 1968, during an inspection of defendants' converter operations contained 25.54% silica, of which 73.11% was present in the uncombined form.

The "flue dust" generally contains about 15% silica. A sample of this material obtained by plaintiffs during the inspection on April 8, 1968, contained 12.55% silica, of which 92.02% was present in the uncombined form.

The effective silica content of the flue dust and aisle cleanings is somewhat higher than the analyses indicate, because these materials contain substantial amounts of metallic copper which melt and become a part of the molten charge in the converter when these materials are added into the converter. On a copper-free basis, the flue dust sample taken April 8, 1968, was 21.3% silica, and the aisle cleanings sample taken April 8, 1968, was 38% silica.

## 8.

The silica content of the flue dust and aisle cleanings was lower than the silica

## 9.

The aisle cleanings and flue dust employed by defendants fall within the scope of the words "a silica flux" used in the claims of the Redmond Patent as they contain quantities of uncombined silica which are sufficient to achieve the results of the Redmond Process when added at proper times, and are literally a "flux" within the broad meaning of that word. The patent specification does not indicate that the exact nature of the silica-containing material is critical and does not specify any particular percentage silica in the material used to form the solid blanket, indicating rather that the material "may" be regular converter flux.

Thus, defendants' general practice regarding the addition of silica-bearing materials departs from the literal words of Claims 1 and 3 regarding the addition of silica flux only in the point at which the silica is added. Even though the silica is added earlier than the optimum "worm-about-to-disappear" stage, defendants nevertheless maintain the silica in a solid condition such that the silica is present in the desired solid form at the time required to perform its normal function in the Redmond Process, that is, at the time when the worm is just about to disappear and when the sparks

---

1. Minimum: Flue dust: (12,000 lbs.) (12.55% silica) (92.02% uncombined)=
   1380 lbs. uncombined silica.
   Maximum: Aisle cleanings: (16,000 lbs.) (25.54% silica) (73.11% uncombined)=2976 lbs. uncombined silica.

from the molten mass of material begin to have the appearance of breaking or bursting. The testimony of the expert witnesses establishes that it is the presence of silica in the proper physical condition at the proper time which is the important feature of the Redmond Process and that the Redmond Patent so indicates to a person skilled in the copper smelting art. The testimony of the expert witnesses further establishes that the patent indicates to those skilled in the art that in order to be in the proper physical condition to perform its function, the silica must be uncombined and in solid form at the proper time. The evidence does not show that the patent indicates to those skilled in the art that the silica needs any other attributes at that time.

### 10.

A sample was taken from the blanket on a finished charge in the converter on April 8, 1968. This sample was later subjected to chemical analysis. 18.5% of the material, other than copper in this sample, was silica. Of the silica, 69.35% was in an uncombined state. Thus, on a copper-free basis, the sample was 12.8% uncombined silica.

There was no evidence that the composition of this sample was other than representative of the composition of the whole blanket, nor that the blanket in the converter on that charge was other than representative of the blankets produced on all charges finished in the period from March 15, 1968, to April 18, 1968.

Although the evidence is not as clear as it might be, it seems that the preponderance of all the evidence is in favor of a finding that the chemical composition of the blankets produced in the period from August 26, 1965, to July 15, 1967, was not greatly different from the composition shown in the sample taken on April 8, 1968.

Thus, the court finds that the processes used in the defendants' smelter from August 26, 1965, to April 18, 1968, produced blankets on the charge at the worm-going-off stage which contained appreciable quantities of uncombined silica.

### 11.

The testimony established that in the period prior to August 26, 1965, discrete solid granules of a material which was mostly magnetite formed on the surface of the molten charge during the blowing period. This was known as "granulated slag." The charge in the converter could not be poured from beneath this granulated slag unless a dam of some sort was formed to hold the granulated slag from pouring out with the charge. After solid silica was charged into the converter, and the charge was blown for a short time, a blanket was present on the surface of the charge which was made up of solid material which agglutinated to the point that the charge could be poured from beneath the blanket without any dam being needed to keep the blanket in the converter during the pouring process.

During the period from August 26, 1965, to April 18, 1968, the evidence shows that normally it was not necessary to use a dam to keep the blanket in the converter when the charge was poured out. Although witnesses for the defendants referred to the blanket present in the converter during these periods as a granulated blanket, the blanket was normally sufficiently agglutinated to remain in a coherent mass when the charge was poured from underneath it. Thus, the practices followed in this period normally produced a blanket in the converter which was in substantially the same solid form as the blanket produced during the earlier infringing period, and in substantially the same solid form as would be produced by the practice of the Redmond Process according to the preferred form as taught by Claims 1 and 3 of the patent.

### 12.

Over the period from August 26, 1965, to September 16, 1966, the converters intermittently produced flat or peahole copper. This intermittent result over a long period indicates that the process as

then practiced was capable of producing flat or peahole copper, when performed most effectively. The process was therefore capable of producing, and at times did produce, substantially the same results as if the instructions of the Redmond Patent were exactly followed in the manner prescribed for optimum results.

During the period from September 16, 1966, to July 14, 1967, the practice followed at San Manuel regularly produced flat or peahole copper. It thus produced substantially the same results as if the instructions of the Redmond Patent were exactly followed in the manner prescribed for optimum results.

■ During the period from March 15, 1968, to April 18, 1968, the practice followed at the smelter occasionally produced flat or peahole copper. Such results, obtained only intermittently over a short period of time, are not sufficient evidence upon which the court can base a finding that the process then practiced, when practiced in its best form, was capable of producing substantially the same results as if the instructions of the Redmond Patent were exactly followed in the manner prescribed for optimum results.

### 13.

■ During the period from August 26, 1965, through July 14, 1967, the defendants achieved substantially the same results in substantially the same fashion as if they had followed exactly the instructions of the Redmond Patent, and they did so according to the teachings of the Redmond Patent rather than the teachings of the prior art. The court thus finds that defendants' operations in this period infringed Claims 1 and 3 of the Redmond Patent under the Doctrine of Equivalents.

During the period from July 15, 1967, through March 14, 1968, no copper was produced at the San Manuel smelter due to a strike, and there is no contention that the defendants infringed the Redmond Patent during this period.

During the brief period from March 15, 1968, to April 18, 1968, the defendants may have infringed the Redmond Patent under the Doctrine of Equivalents. However, the court finds the evidence is inadequate and thus finds that the plaintiffs have not established that the defendants' operations during this period actually infringed the Redmond Patent.

During the period from April 19, 1968, up through the time the court heard evidence in this case, the parties are agreed and the court finds that there was no infringement of the Redmond Patent by the defendants.

### 14.

The interpretation of Claims 1 and 3 to cover defendants' operations as set forth in these findings does not conflict with the construction which plaintiffs urged at the earlier trial. This is true even though the parties and the court were, at that time, mainly concerned with the validity of the patent, and only one process used by the defendants was involved which differed from the instructions of the patent regarding the preferred form of the Redmond Process only in minor ways.

■ As construed herein, Claims 1 and 3 do not read on any prior art process.

### 15.

■ The Doctrine of File Wrapper Estoppel does not apply to Claims 1 and 3 as construed herein, as they were never narrowed by amendment during the prosecution of the patent application in respect of the point of addition of the silica.

### 16.

The prior findings and memorandum decision establish as an adjudicated fact that Redmond made an important and meritorious contribution to the copper smelting art. Redmond provided the first method known and used in the United States of producing flat or peahole

copper in a converter on a practical commercial basis. The findings establish the facts that Redmond solved serious problems in the art, that prior attempts to solve these problems had failed, and that defendants promptly adopted the process in preference to their then-present practices. Furthermore, defendants refused to cease using the Redmond Process, as the court previously found, even before the patent issued and countermanded Redmond's orders to his workmen that they return to the prior art blister process. Defendants' acts, as established by the previous findings and decision, are cogent evidence that they themselves attached significant value to the Redmond Process at the time the patent was granted.

### 17.

The design capacity of defendants' San Manuel smelter was 6,000 tons per month of anode copper. The smelter output reached this figure while using the Redmond Process and has since substantially and continuously exceeded the design capacity.

Defendants used the optimum and preferred embodiment of the Redmond Process for eight years and a less desirable embodiment of the Redmond Process for an additional two years, and it is thus reasonable to assume that they achieved substantial benefits from its use, or at least thought they did.

The defendants considered the Redmond Process to have significant value when they adopted it and at the time they received notice of infringement, as shown by defendants' adoption of the Redmond Process in preference to the other processes then available and defendants' long use of the infringing process for over nine years despite notice of infringement, the prospect of substantial litigation costs, and the prospect of significant liability for their acts.

### 18.

■ Considering the nature of the Redmond Process invention, its apparent utility and advantages over the prior processes and others known and available to defendants during the infringing period, as found by the court's prior findings and memorandum decision, as established by the clear and reasonable inferences arising from defendants' own actions throughout this litigation, and considering the extent of the use made of the Redmond Process by defendants, the court finds that if the parties had bargained in good faith at the time the patent issued for a license containing the usual terms and conditions found in such a license, the royalty rate to which the parties would have agreed would have been about one dollar per ton of the anode copper product produced by defendants.

Accordingly, the court fixes the damages under the first paragraph of 35 U.S.C. § 284 at said one dollar per ton. The court further finds this to be a reasonable and conservative value under all the evidence in this case.

### 19.

Defendants made a considered and deliberate decision to appropriate the Redmond Process. This decision was made with full knowledge, first, of Redmond's contention that his process was unique and that a patent had been applied for, and, later, of the issuance and existence of the Redmond Patent. This decision was made prior to seeking the advice of patent counsel. Defendants knowingly misrepresented to plaintiffs that they were not using the Redmond Process and took a determined position that the Redmond Patent was invalid in view of the prior art prior to making investigations of the state of the art. When defendants finally retained patent counsel they did not inform him of important and material facts bearing directly upon the validity of the patent and the scope of the claims. Defendants attempted to conceal their future infringing activities and to exert economic pressure upon Redmond by firing him from his employment, whereupon he was unable thereafter to obtain employment in the only oc-

cupation he knew. Even though every defense asserted by defendants relating to the validity of the Redmond Patent was discredited and found to be without merit by Judge Walsh of this court in the Kennecott case, as set out in Finding 17 of the earlier findings of fact herein on the issue of validity, and even though defendants had almost immediate knowledge of the decision in that case, they nevertheless continued their infringing activities, using a process which fell directly within the literal scope of the claims of the Redmond Patent.

At the trial on the issue of validity, defendants, through counsel, employed vexatious tactics. Without good cause and at great cost to plaintiffs, the defendants completely relitigated the issues as to validity which had been fully considered and found to be without merit by Judge Walsh of this court in the Kennecott case.

### 20.

The court finds that defendants made a conscious, considered and deliberate decision to infringe the Redmond Patent, heedless of the consequences; that such decision was made in August or September, 1959, without the advice of patent counsel; and that, following the decision in the Kennecott case, the defendants could not in good faith doubt either the validity of the Redmond Patent, or that they were infringing the patent in their operations from then until August 26, 1965. Defendants' conduct since their initial decision to continue the use of the Redmond Process after Redmond requested that they cease, and particularly after the patent was issued and later found valid in the Kennecott case, clearly demonstrates and confirms the willful and deliberate character of defendants' acts.

■ The court further finds that the actions of the defendants in vexatiously relitigating the issue of validity of the Redmond Patent in this case constitute "special circumstances" within the meaning of that term in relevant decisions dealing with the award of attorney fees

in patent infringement cases, making it unjust and unfair for the plaintiffs to pay substantial attorney fees incurred in relitigating the issue of validity in this case.

### 21.

A memorandum in support of the foregoing findings of fact may be filed following the entry of the final judgment and decree herein. Insofar as the memorandum may contain any findings of fact they may be considered as supplemental to the findings of fact herein.

From the foregoing findings of fact, the court makes the following

## CONCLUSIONS OF LAW

### 1.

Defendants' converter operations at their San Manuel Smelter in the period August 26, 1965, to July 14, 1967, infringed Claims 1 and 3 of the Redmond Patent, U.S. 2,895,821.

### 2.

Plaintiffs are entitled to damages adequate to compensate for defendants' infringement equal to a royalty of one dollar per ton of anode copper produced at the San Manuel smelter in the period July 22, 1959, through July 14, 1968.

### 3.

■ Defendants' infringement of the Redmond Patent was willful and deliberate during the period from April 27, 1962, when findings of fact and conclusions of law were entered in the Kennecott case, to August 26, 1965. The damages assessed against defendants with respect to said period are hereby doubled under 35 U.S.C. § 284.

### 4.

This case involves exceptional circumstances and the court awards plaintiffs seventy-five percent. of reasonable attorneys' fees incurred during the first trial herein to and including services rendered until entry of judgment on September 14, 1966, under 35 U.S.C. § 285.

**5.**

The court fixes the interest rate at 6% simple interest as of the end of each calendar year during the period of infringement.

ADDITIONAL SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DAMAGES

The court makes the following findings of fact and conclusions of law to supplement those made in this case on March 12, 1969:

**1.**

During the periods indicated below, defendants produced the indicated quantities of anode copper at their San Manuel Smelter:

| Year | Production (tons) | Year | Production tons) |
|---|---|---|---|
| 1959 (7/21–12/31) | 5,421 | 1964 | 92,588 |
| 1960 | 81,724 | 1965 (1/1–8/26) | 59,234 |
| 1961 | 82,612 | (8/27–12/31) | 34,533 |
| 1962 (1/1–4/27) | 26,171 | 1966 | 101,390 |
| (4/27–12/31) | 58,037 | 1967 (1/1–7/14) | 53,931 |
| 1963 | 88,536 | | |

**2.**

Applying a damage rate of $1.00 per ton of anode copper produced during the periods July 21, 1959–April 27, 1962 and August 27, 1965–July 14, 1967, and applying a damage rate of $2.00 per ton of anode copper produced during the period April 28, 1962–August 26, 1965, to the production data set forth in Finding No. 1, the court fixes the base damage award for the period July 21, 1959–July 14, 1967 at Nine Hundred Eighty-two Thousand Five Hundred Seventy-two and no/100 ($982,572.00) Dollars.

**3.**

Applying the damage rates stated in finding numbered 2 to the production figures stated in finding numbered 1, the court fixes the amount of damage due at the end of each calendar year during the period of infringement and the interest payable to plaintiffs on account thereof as follows:

| End of Year | Royalty ($) | Years Due | Interest at 6% to 4/1/69 |
|---|---|---|---|
| 1959 (7/21–12/31) | $ 5,421 | 9.25 | $ 3,008.66 |
| 1960 | 81,724 | 8.25 | 40,453.38 |
| 1961 | 82,612 | 7.25 | 35,936.22 |
| 1962 (1/1–4/27) | 26,171 | | |
| (4/28–12/31) | 116,074 | | |
| | 142,245 | 6.25 | 53,341.88 |
| 1963 | 177,072 | 5.25 | 55,777.68 |
| 1964 | 185,176 | 4.25 | 47,219.88 |
| 1965 (1/1–8/26) | 118,468 | | |
| (8/27–12/31) | 34,533 | | |
| | 153,001 | 3.25 | 29,835.20 |
| 1966 | 101,390 | 2.25 | 13,687.65 |
| 1967 (1/1–7/14) | 53,931 | 1.25 | 4,044.83 |
| | $982,572 | | $283,305.38 |

## 4.

▮ Plaintiffs' attorneys expended 3642.72 hours and 26 days in trial in connection with the prosecution of this litigation up to September 14, 1966, the date of entry of judgment after the first trial herein. In view of the complexity and difficulty of the questions involved, the skill requisite to properly conduct the cause, the professional standing and ability of counsel, the customary minimum charges of the Bar for non-specialized services in this court, the customary charges of plaintiffs' counsel for such work, the amount involved in this controversy and the benefits resulting from such services, the court finds that $50.00 per hour and $350.00 per day constitute reasonable attorneys' fees for plaintiffs' attorneys' work expended during this period.

At such reasonable rates, the court fixes plaintiffs' reasonable attorneys' fees up to September 14, 1966 at $191,-236.00. Seventy-five per cent of such reasonable attorneys' fees as provided by conclusion numbered 4 of the court's findings herein dated March 12, 1969 total $143,427.00.

## 5.

The court fixes the amount to be awarded to plaintiffs for their necessary costs and disbursements in this litigation to date as follows:

| | |
|---|---:|
| To clerk, U. S. District Court: | $ 33.50 |
| To process server for fees and expenses: | 314.60 |
| For publications such as books, magazine articles, patent copies, etc., introduced as exhibits herein: | 92.55 |
| For preparation of exhibits such as models, demonstrative charts, photographs, enlargements of defendants' processing records, etc.: | 858.40 |
| Brought forward | $1,299.05 |
| For costs of duplicating briefs in District Court: | 1,010.80 |
| For court reporter, per diem and costs of necessary copies of depositions and transcripts: | 6,958.45 |
| | $9,268.30 |