## UNDERWATER DEVICES INCORPORATED, Appellee,

v.

## MORRISON–KNUDSEN COMPANY, INC., Appellant.

## MORRISON–KNUDSEN COMPANY, INC., Appellant,

v.

## Lester A. HAUG, Don W. Schmid and Herman Gunther, Appellees.

### Nos. 83–633, 83–634.

United States Court of Appeals, Federal Circuit.

Sept. 23, 1983.

John E. Kidd, New York City, for appellant. With him on brief were Joseph J.C. Ranalli and Stephen J. Harbulak, New York City; Kenneth R. Kupchak, Honolulu, Hawaii, of counsel.

Robert E. Lyon, Los Angeles, Cal., for appellee. With him on brief was Richard E. Lyon, Jr., Los Angeles, Cal.; Richard L. Griffith and Larry T. Takumi, Honolulu, Hawaii, of counsel.

Before FRIEDMAN, RICH and KASHIWA, Circuit Judges.

KASHIWA, Circuit Judge.

This is a consolidated appeal from judgments of the United States District Court for the District of Hawaii (Civil Nos. 74–296 and 79–0120), entered November 30, 1982. In a published opinion, *Underwater Devices Inc. v. Morrison-Knudsen Co.*, 217 USPQ 1039, the district court held that the appellant, Morrison-Knudsen Co. ("M–K"), had infringed claim 1 of appellees' U.S. Patent No. 3,204,417 (the "'417 patent") [1] and claims 1–4 of appellees' U.S. Patent Re. 29,364 (the "reissue patent"). [2] The district court then awarded $200,000 as damages to the appellees and trebled that amount. In addition, prejudgment interest was assessed on the entire trebled amount of $600,000. The antitrust issues were dismissed with prejudice. We affirm in part and reverse in part.

### The Invention

Appellant's invention relates to a method and an apparatus for laying underwater pipes such as sewer lines. The invention is best illustrated by the broadest independent claims in the patents. Claim 1 of the reissue patent states:

1. The method of laying pipe on the floor under a body of water, comprising the steps of: releasably securing a length of pipe to a mobile frame; lowering said frame and pipe in said body of water to a stable position wherein said frame is supported securely by and in fixed relation to said floor with said length of pipe generally aligned with but spaced from the end of a pipeline already on said floor; moving at least a portion of said length of pipe, laterally of its length and relative to said frame, while holding the same secured thereto and supported thereby to bring the axis of said length of pipe into a desired and stable relation to the axis of said pipeline; and then moving said length of pipe axially, relative to said frame while holding the same secured thereto and supported thereby, into engagement with the end of said pipeline to form a continuation thereof.

Claim 1 of the '417 patent states:

1. An underwater pipe laying apparatus comprising:

a rigid frame means including horizontally spaced parallel transverse members and depending legs in rigidly fixed relation thereto adjacent each end;

an elongated spine spanning said transverse members;

1. U.S. Patent No. 3,204,417, issued to Spencer H. Robley on September 7, 1965, entitled "Underwater Pipe Laying Apparatus," from an application filed October 28, 1963.

2. U.S. Patent Re. 29,364, reissued to Spencer H. Robley, Deceased, on August 23, 1977, entitled "Method of Submarine Pipe Laying," from an application filed December 14, 1976. The original patent of the reissue patent is U.S. Patent No. 3,267,682 (the "'682 patent"), issued on August 23, 1966, from an application filed December 21, 1964.

said spine having portions disposed toward each end thereof movably secured to the transverse members for movement of the spine and said portions longitudinally of said transverse members;

means operatively connected to and between said spine and the frame means providing movement of the longitudinal axis of the spine to a position having a direction other than at right angles to the parallel axes of the transverse members; and

depending hanger means longitudinally movably supported by the spine for supporting a pipe section beneath said spine and between said legs.

### Background

Spencer H. Robley filed an application for the apparatus on October 28, 1963, which subsequently issued as the '417 patent. In addition, he filed another application for the method on December 21, 1964, which subsequently issued as the '682 patent. The method application, however, did not claim priority from the earlier apparatus application as required if the benefits of 35 U.S.C. § 120 are desired.[3]

In response to the examiner's initial rejection of the method application under 35 U.S.C. § 112, Robley filed an amendment, dated November 3, 1965, in which he stated that the "applicant can make definite refer-

ence * * * to his corresponding issued apparatus case which does show *one means* in detail for carrying out the steps of the instant method claims." [Emphasis in original.] In a supplemental amendment filed March 16, 1966, Robley requested the addition of the following passage in the specification of the method application:

As already pointed out, the drawings herein are merely diagrammatic and are not intended to show all structural details of a practical apparatus. They designate components that are well known types of mechanisms to those skilled in the art. For a more detailed disclosure of an apparatus capable of performing the present method, please see applicant's Patent No. 3,204,417, issued September 7, 1965.

A patent for the method was thereafter duly issued.

By agreement dated August 31, 1972, Underwater Devices Inc. ("UDI"), the assignee of the '417 and '682 patents, licensed Buckley & Company, Inc. and R.W. Denny Corp. to "jointly and not severally" use and practice the Robley inventions. This license contained a provision for royalty payments under some circumstances. The royalty was to be based on a formula which takes into account the diameter and length of pipes laid, depth of lay and adjustments for changes in construction cost over time.[4]

---

**3.** 35 U.S.C. § 120, at the time of the application for the '682 patent, stated:

An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier application.

*See* 37 C.F.R. § 1.78.

**4.** The formula in the Buckley/Denny license is as follows:

LICENSEES jointly or severally shall compensate LICENSOR at the rate of $.025 per

inch diameter of pipe per foot of pipe length plus $2.00 per foot of pipe length for any pipe the LICENSEES might lay with the patented device or using the patented process anywhere on the Atlantic Coast of the United States or the Gulf Coast of the United States in depths up to 50 feet of water measured from mean low water to the ocean floor, and;

at the rate of $.05 per inch diameter of pipe per foot of pipe length plus $4.00 per foot of pipe length for any pipe the LICENSEES might lay with the patented device or using the patented process in the same limited area of the United States in depths of water ranging from 50 feet to 100 feet measured from mean low water to the ocean floor.

After December 31, 1973, the rates above set forth shall be adjusted by a factor derived by dividing the Engineering News Record Construction Cost Index in effect on the date any new project is bid by the current index

By letter agreement dated March 15, 1974, UDI granted Hood Corporation a royalty free, nonexclusive worldwide license to make, use and practice the Robley inventions, with limitations. Similarly to the Buckley/Denny license, a royalty was to be paid under some circumstances. The agreement set forth a formula beginning with the same rates as those in the Buckley/Denny license but continuing on with rates for use in depths of water from 100 to 150 feet, 150 to 200 feet, 200 to 250 feet and over 250 feet.[5]

When M–K was bidding on an underwater sewer project for Sand Island, Hawaii, UDI wrote a letter to M–K on September 28, 1973, advising that it was the owner of the Robley patents. It was UDI's common practice to advise prospective bidders for construction of ocean pipelines that UDI was the owner of the Robley patents and that UDI would grant a license for the use of the patented method and apparatus. All prospective bidders on the same project were offered the same terms. The letter, in pertinent part, stated:

> For the Sand Island Ocean Outfall [sewer line], the * * * [Robley] method and apparatus appears to be the optimum applicable method for the installation of approximately 10,000 feet (end of trestle to end of diffuser) of the proposed outfall pipe.
>
> * * * * * *
>
> To accomplish this project in conformance with the above reference, Underwater Devices is prepared to grant a license for the use of our patented method and apparatus to the contractor selected for the construction of the Sand Island Ocean Outfall. The complete license fee for this project has been established as $200,000.

After M–K was awarded the project, UDI reiterated the $200,000 license fee of-

effective as of the date of December 31, 1973, which factor shall be used as a multiplier to the rates herein quoted.

**5.** The royalty provision of the Hood agreement is as follows:

> (h) In determining the royalty upon which the license fee to be paid shall be computed under the circumstances provided for in paragraphs b and c above, the royalty shall not exceed the least amount for which the right to practice such inventions had been offered to any other bidder for the same construction contract. In the event that a license had not been offered to any other bidder or subcontractor, or in the event that Hood or Hood and its associates or partners are the only bidders or are negotiating to do such work of construction on a non-competitive basis, the license fee shall be negotiated in good faith, but in no event shall the fee for work done exceed a fee computed according to the following formula:
>
> At the rate of $.025 per inch diameter of pipe per foot of pipe length, plus $2.00 per foot of pipe length for any pipe laid with the patented device or using the patented process in depths of water up to 50 feet, measured from mean low water to the ocean floor;
>
> At the rate of $.05 per inch diameter of pipe per foot of pipe length, plus $4.00 per foot of pipe length for any pipe laid with the patented device or using the patented process in depths of water ranging from 50 to 100 feet, measured from mean low water to the ocean floor;
>
> At the rate of $.10 per inch diameter of pipe per foot of pipe length, plus $8.00 per foot of pipe length for any pipe laid with the patented device or using the patented process in depths of water ranging from 100 to 150 feet, measured from mean low water to the ocean floor;
>
> At the rate of $.15 per inch diameter of pipe per foot of pipe length, plus $12.00 per foot of pipe length for any pipe laid with the patented device or using the patented process in depths of water ranging from 150 to 200 feet, measured from mean low water to the ocean floor;
>
> At the rate of $.20 per inch diameter of pipe per foot of pipe length, plus $16.00 per foot of pipe length for any pipe laid with the patented device or using the patented process in depths of water ranging from 200 to 250 feet, measured from mean low water to the ocean floor;
>
> At the rate of $.25 per inch diameter of pipe per foot of pipe length, plus $20.00 per foot of pipe length multiplied by the depth of the water in which the pipe is laid divided by 250 for any pipe laid with the patented device or using the patented process in depths of water over 250 feet, measured from mean low water to the ocean floor; and
>
> The rates above set forth shall be adjusted by a factor derived by dividing the Engineering News Record Construction Cost Index for the date any new project is bid by the current Index, namely, 1940, which factor shall be used as a multiplier to increase or decrease the rates herein quoted.

fer in a letter dated May 15, 1974. M–K, however, did not seek a license. Instead, M–K immediately investigated ways of getting around the Robley patents. A search in the United States Patent and Trademark Office (the "PTO") for prior art was instituted. M–K's in-house attorney, A.J. Schlanger, advised Jack Christensen, a regional manager, in a memorandum dated December 18, 1973, that M–K "could use the * * * [prior art] system * * * to place the above outfall without the need to pay anyone a royalty if the system is not described in any of the patents we received from the patent research firm." This one-sentence memorandum did not deal with the validity or infringement of the Robley patents. In addition, Schlanger wrote to Christensen in a memorandum dated May 24, 1974:

> This is in response to your recent note asking for advice on how to respond to Underwater Devices' May 15, letter.
>
> As we have discussed in the past, it would be in M–K's best interest to take a firm stand that we will not pay a royalty to Underwater Devices for the following reasons:
>
> (1) The May 17, 1951, Engineering News-Record article closely enough described the apparatus and method referred to in Underwaters' patents to make invalid such patents; the Engineering News-Record article having been published more than one year prior to Underwaters' patent applications.
>
> (2) Even if the Engineering News-Record article does not fully describe Underwaters' apparatus and method, such apparatus and method are simply a further development of the apparatus and method described in the Engineering News-Record article. Therefore, the Underwaters' patent would be found to be invalid, and
>
> (3) Courts, in recent years, have—in patent infringement cases—found the pat-

ents claimed to be infringed upon invalid in approximately 80% of the cases.

> I would recommend we continue to refuse to even discuss the payment of a royalty with Underwater Devices. Underwater Devices must recognize that if they sue us, they might kill the goose that lays the golden eggs.
>
> If they do elect to sue us, then we can consider negotiating a royalty based on what it might cost us to try the suit. If we are going to use the device for other projects, however, we might want to go all the way and let the court decide who is right.
>
> P.S. The Martineau & Knudson indicated as a "copy addressee" on Underwater Devices' letter, is a law firm in Los Angeles whose specialties, as indicated in a law directory, are general, civil and trial practice and corporate and tax law. Apparently, Underwater Devices has not consulted with a patent attorney as yet.

Thereafter M–K, as said by the district court, "hung tough." By letter dated July 10, 1974, Christensen informed UDI that M–K considered the Robley patents to be invalid. By letter dated July 23, 1974, Schlanger informed UDI's counsel that "payment of royalty would be inappropriate." By memorandum dated September 5, 1974, Schlanger stuck by his opinion that the patents were invalid. However, Schlanger did not order the file histories of the Robley patents until September 5, 1974. In addition, M–K did not receive the opinion of its patent counsel until November 30, 1974. UDI withdrew its offer to license in November, 1974.

The apparatus constructed by M–K was used from August 15, 1974, to about May 1, 1975. UDI filed Civil No. 74–296 (Appeal No. 83–633) on November 21, 1974, alleging infringement and seeking damages.

On December 14, 1976, UDI, the appellee, filed an application for reissue [6] of the '682

---

6. 35 U.S.C. § 251, the reissue statute, states in pertinent part:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by

reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of

patent in order to obtain, *inter alia,* the benefits of the earlier filing date of the '417 patent. The PTO allowed the inclusion of the following sentence in the reissue patent:

> This is a continuation-in-part of application Ser. No. 319,126, filed October 28, 1963, now U.S.Pat. No. 3,204,417, issued Sept. 7, 1965.

On March 12, 1979, M–K filed the second of the lawsuits, Civil No. 79–0120 (Appeal No. 83–634), asserting violation of the antitrust laws by the named individuals, shareholders of UDI. The district court consolidated these actions [7] and, upon stipulation, stayed the antitrust issues pending the outcome of the patent issues.

### District Court Proceeding

In April, 1981, the district court found that the '417 and reissue patents were valid. In addition, the court found that M–K willfully infringed both claim 1 of the '417 patent and claims 1–4 of the reissue patent during the Sand Island project.

The district court then found $200,000 to be a reasonable royalty under 35 U.S.C. § 284 [8] and awarded such an amount to UDI as damages. The court based its finding on the estimated royalty fee, $200,000, quoted in UDI's letter to prospective bidders. In addition, the court stated:

> [T]he application of the formulae in the earlier agreements entered into by UDI,

the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent.

7. After the reissue patent was granted in 1977, UDI filed an amended complaint in which the reissue patent was substituted for the '682 patent.

8. 35 U.S.C. § 284 in pertinent part states:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event

and especially the agreement with Hood Corporation dated March 15, 1974, would have resulted in a royalty of about $200,000.[75] [Other footnotes omitted.]

---

75 Plaintiff's Ex. 144 [UDI's letter to M–K dated September 28, 1973] refers to 10,000 feet of proposed outfall pipe past the trestle. There was evidence that 84-inch diameter pipe was laid. In the range of 100 to 150 feet depth overall, this works out to a royalty of $164,000. In the range of 150 to 200 feet depth overall, this works out to a royalty of $246,000.

After trebling the $200,000 damage award to $600,000 for willful infringement, the district court assessed prejudgment interest of 10% uncompounded interest on the entire $600,000 amount.

M–K then filed a motion for new trial or in the alternative, an amendment of the findings of fact and conclusions of law in light of allegedly newly discovered prior art.[9] M–K alleged that the newly discovered prior art discloses the lateral and twisting capability of the Robley apparatus. After a hearing, the district court denied M–K's motion for a new trial on the ground that the newly discovered prior art added "nothing that was not already present in the Tower and the Ferris jack-up barge against which the Robley patents were fully evaluated * * *." [10] Thus, the district court re-lodged its earlier decision with additional findings of fact that indicated that the inventions of the '417 and reissue pat-

the court may increase the damages up to three times the amount found and assessed.

9. The newly discovered prior art was Minty, U.S. Patent No. 3,081,884 (the "Minty '884 patent") and Ramsden, U.S. Patent No. 3,052,321 (the "Ramsden patent"). The Minty '884 patent discloses a gantry-like apparatus which is capable of lifting and repositioning a load. The Ramsden patent discloses a gantry crane assembly for transferring a load from one position to another. More specifically, the assembly has the capability of twisting the load to any desired degree.

10. The "Tower" apparatus was an underwater pipelaying device that was in use as early as 1951. The "Tower" was not before the PTO during the prosecution of the Robley patents. The Ferris pipelaying barge was in use as early as 1957.

ents were not obvious in view of the prior art.

### Appellant's Arguments

Regarding invalidity of the '417 and reissue patents, the appellant argues that the district court erred in its failure to consider the newly discovered pertinent and material invalidating prior art which was not before the PTO. In particular, the appellant contends that (1) the district court erred in finding the newly discovered prior art to be merely cumulative of the prior art already in the record; (2) the district court improperly relied on the presumption of validity of patents and erred in requiring M–K to prove the invalidity of the Robley patents by clear and convincing evidence when the newly discovered prior art was not before the PTO; and (3) this court should, in the public interest of not upholding invalid patents, consider the newly discovered prior art.

Concerning infringement, the appellant argues that (1) the district court erred in not according M–K intervening rights in the method invention of the reissue patent; and (2) the district court failed to properly construe the scope of claim 1 of the '417 patent in light of the file history of the '417 patent.

Further, the appellant argues that the district court erroneously awarded prejudgment interest on the punitive or enhanced portion of the damages.

Last, the appellant argues that the district court's finding of willful infringement was erroneous.

### OPINION

### I. *Validity*

■■■ The appellant contends that the district court erred in finding the newly discovered prior art to be merely cumulative of the prior art already in the record,

especially the "Tower" apparatus and the Ferris barge. We disagree. The standard of review of a district court's denial of a motion for a new trial is abuse of discretion. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). The right to a new trial requires, *inter alia,* that the movant is diligent, that the newly discovered prior art is not merely cumulative, that the prior art is material, and that the prior art will probably produce a different result. *See McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 410, 145 USPQ 6, 29 (10th Cir.1965), *cert. denied,* 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). In the instant case the district court found the newly discovered prior art to be not material, but rather, merely cumulative of the prior art already in the record. In particular, the appellant failed to show that it was diligent in bringing the newly discovered prior art to the district court's attention. *See Pacific Contact Laboratories, Inc. v. Solex Laboratories, Inc.,* 209 F.2d 529, 533–34, 100 USPQ 12, 15 (9th Cir.1953), *cert. denied,* 348 U.S. 816, 75 S.Ct. 26, 99 L.Ed. 643 (1954). M–K failed to explain or excuse the seven-year delay in "discovering" this new prior art. Moreover, this new prior art was not discovered until the appellant had its day in court and after new counsel had been substituted for its trial counsel. In addition, the newly discovered prior art did not prima facie compel a different result. *See Borg-Warner Corp. v. Mall Tool Co.,* 220 F.2d 803, 806, 105 USPQ 147, 149 (7th Cir.1955). The district court, thus, did not abuse its discretion in denying appellant's motion.

■■■ The appellant also contends that the district court improperly relied on the presumption of validity as provided in 35 U.S.C. § 282 [11] in its findings of validity of the '417 and reissue patents. For instance, the "Tower" apparatus, Minty '884 patent and Ramsden patent were not before the PTO during the prosecution of the '417

---

11. 35 U.S.C. § 282 in pertinent part states:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the valid-

ity of other claims * * *. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

and '862 patents. Contrary to appellant's contention, the party asserting invalidity bears the burden of proof even if the prior art references were not before the PTO. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530 at 1534 (Fed.Cir.1983); *Solder Removal Co. v. USITC,* 582 F.2d 628, 632–33, 199 USPQ 129, 132–33, 65 Cust. & Pat.App. 120 (1978). Although the appellant contends that the standard of proof should change from the "clear and convincing" standard to the "preponderance of the evidence" standard once it presents prior art not before the PTO, we need not decide which standard is appropriate since the appellant had failed to meet its burden under either standard.

 The appellant further contends that because of the public interest in striking down invalid patents, this court should consider the Minty '884 and Ramsden patents. Since these patents are not in the record, we cannot do so. Unless authorized by statute, appellate courts cannot consider evidence de novo. *See Youngs Rubber Corp. v. C.I. Lee & Co.,* 45 F.2d 103, 106, 8 USPQ 6, 7 (2d Cir.1930); *Chisholm-Ryder Co. v. Buck,* 65 F.2d 735, 18 USPQ 31 (4th Cir.1933).

Accordingly, we agree with the holding of the district court that the appellant did not sustain its burden of showing the patents to be invalid.

## II. *Infringement*

 Appellant contends that the district court erred in not according M–K in-tervening rights in the method invention of the reissue patent. We, however, disagree. Intervening rights, as provided under 35 U.S.C. § 252,[12] is an affirmative defense, *see Devex Corp. v. Houdaille Industries, Inc.,* 382 F.2d 17, 24, 154 USPQ 384, 389 (7th Cir.1967), that must be raised at trial. 35 U.S.C. § 282.[13] Failure to plead an affirmative defense is a waiver of that defense; it cannot be raised for the first time on appeal. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 66, 74, 174 USPQ 129, 135 (3d Cir.1972), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). Appellant may not raise this defense for the first time at the appellate stage. Accordingly, we agree with the district court that claims 1–4 of the reissue patent were infringed by the appellant.[14]

 Appellant also contends that the district court failed to properly construe the scope of claim 1 of the '417 patent in light of that patent's file history. We, however, need not reach this issue since the damage award will stand if either the '417 patent or the reissue patent was infringed. The district court based its award of $200,000 on the royalty formulae in UDI's agreements, especially the agreement with Hood Corporation. The formula in that agreement includes:

> At the rate of $.05 per inch diameter of pipe per foot of pipe length, plus $4.00 per foot of pipe length for any pipe laid with the patented device *or* using the patented process in depths of water rang-

---

**12.** 35 U.S.C. § 252 in pertinent part states:

No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

**13.** 35 U.S.C. § 282 in pertinent part states:

The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:
(1) Noninfringement, absence of liability for infringement, or unenforceability * * *.

**14.** Appellant's counsel virtually admitted to this court at oral argument that the appellant infringed claims 1–4 of the reissue patent.

ing from 50 to 100 feet, measured from mean low water to the ocean floor;

At the rate of $.10 per inch diameter of pipe per foot of pipe length, plus $8.00 per foot of pipe length for any pipe laid with the patented device *or* using the patented process in depths of water ranging from 100 to 150 feet, measured from mean low water to the ocean floor * * *. [Emphasis supplied.]

We interpret the use of the disjunctive "or" to mean that the use of either the patented process (reissue patent) or the patented apparatus ('417 patent) results in the same royalty fee.

Accordingly, since we affirmed the holding that the appellant infringed the reissue patent, we need not reach the issue of whether the '417 patent was also infringed.

### III. *Prejudgment Interest*

The appellant further argues that the district court erroneously awarded prejudgment interest on the punitive or enhanced portion of the damages. We agree.

Contrary to appellees' contention, citing *Brian Jackson Associates, Inc. v. San Manuel Copper Corp.*, 305 F.Supp. 66, 163 USPQ 198 (D.Ariz.1969) and *Corometrics Medical Systems, Inc. v. Berkeley Bio-Engineering, Inc.*, 193 USPQ 467 (N.D.Cal.1977), that the award of prejudgment interest on the punitive or enhanced portion was proper, we hold that prejudgment interest can only be applied to the primary or actual damage portion and not to the punitive or enhanced portion.

Prejudgment interest is awarded to the patent owner for the purpose of making him whole, not only for the value of the actual damage suffered but also for the loss of any possible use of the money between the time of the infringement and the date of the judgment. *General Motors Corp. v. Devex Corp.*, ── U.S. ──, ──, 103 S.Ct. 2058, 76 L.Ed.2d 211, 217 USPQ 1185, 1189 (1983). It is awarded to compensate for the delay in payment of the damages, and not to punish the infringer. In *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 638 F.2d 661 (3d Cir.1981), where the dis-

trict court had doubled the damage award for willful infringement pursuant to section 284, the Third Circuit concluded that the enhanced portion was punitive in character. As such, it held that prejudgment interest could not be assessed on the enhanced portion of the damage award. The Third Circuit stated:

[I]t is clear that the rationale for awarding prejudgment interest on a remedially enhanced damage award, to the extent such a rationale exists, also implies that no prejudgment interest be awarded on a punitively enhanced portion of damages.

*Id.*, at 663. *Accord H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1124, 191 USPQ 486, 493 (6th Cir.1976); *General Electric Co. v. Sciaky Brothers, Inc.*, 415 F.2d 1068, 1076, 163 USPQ 257, 263 (6th Cir.1969).

 In the instant case, the enhanced portion of the damage award, $400,000, is punitive in character since it was assessed by the district court for M–K's willful infringement of UDI's patents. *See infra.* We therefore reverse the district court's award of prejudgment interest on the enhanced or punitive portion of the damage award.

### IV. *Willful Infringement*

Last, the appellant argues that the district court's finding of willful infringement was erroneous. We disagree.

 The district court's finding of willful infringement is a finding of fact, and as such, the standard of review is the clearly erroneous standard. F.R.Civ.P. 52(a). The appellant, however, has failed to show that the district court's finding was clearly erroneous. *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). *See also Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 218 USPQ 781 (Fed.Cir.1983).

 Where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. *See Milgo Electronic*

Corp. v. United Business Communications, Inc., 623 F.2d 645, 666, 206 USPQ 481, 497 (10th Cir.1980), cert. denied, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Such an affirmative duty includes, inter alia, the duty to seek and obtain competent legal advice from counsel before the initiation of any possible infringing activity. See General Electric, supra, at 1073–74, 163 USPQ at 261; Marvel Specialty Co. v. Bell Hosiery Mills, Inc., 386 F.2d 287, 155 USPQ 545 (4th Cir.1967), cert. denied, 390 U.S. 1030, 88 S.Ct. 1409, 20 L.Ed.2d 286 (1968). In this case, M–K obtained its counsel's advice after it commenced its infringing activities. Although Mr. Schlanger did order a patent search and received the results of that search in late 1973, he did not evaluate the validity or infringement of the Robley patents before M–K began the infringing activities. Such an evaluation would generally include an analysis of the file history of the patent. Mr. Schlanger, however, did not order the file histories of the Robley patents until September 5, 1974, well after the infringement had begun. Moreover, M–K did not receive the opinion of its patent counsel until November 30, 1974, long after infringement had commenced and even after the complaint for the instant case was filed.

■ Contrary to appellant's contention that it proceeded with the infringing activities in good faith based on the advice of its counsel, Mr. Schlanger, we disagree. Rather, M–K knew or should have known that it proceeded without the type of competent legal advice upon which it could justifiably have relied. M–K knew that the attorney from whom it sought advice was its own in-house counsel. While this fact alone does not demonstrate M–K's lack of good faith, it is a fact to be weighed. See Western Electric Co. v. Stewart-Warner Corp., 631 F.2d 333, 337, 208 USPQ 183, 187 (4th Cir. 1980), cert. denied, 450 U.S. 971, 101 S.Ct. 1492, 67 L.Ed.2d 622 (1981). In addition, M–K knew or should have known that Mr. Schlanger was not a patent attorney. Again, this fact alone is not controlling, but does bear on the question whether M–K, when it sought advice, did so in good faith.

Although M–K might have demonstrated to the district court that despite any inference arising from these circumstances, it was in fact justified in believing Mr. Schlanger was capable of rendering an independent and competent opinion because he did take the steps normally considered to be necessary and proper in preparing an opinion, it failed to do so. As stated previously, Mr. Schlanger did not order the file histories until September, 1974, such step being a normal and necessary preliminary to a validity or infringement opinion. In addition, M–K might have demonstrated to the district court that its counsel's opinion, without an analysis of the file histories, was in fact thorough and competent. Although the December, 1973 memorandum may be considered legal advice, it was not legal advice upon which the appellant was justified in relying, since it was not based on an evaluation of the validity or infringement of the Robley patents. The May, 1974 memorandum is similarly inadequate. It contains only bald, conclusory and unsupported remarks regarding validity and infringement of the Robley patents. Had it contained within its four corners a patent validity analysis, properly and explicitly predicated on a review of the file histories of the patents at issue, and an infringement analysis that, inter alia, compared and contrasted the potentially infringing method or apparatus with the patented inventions, the opinion may have contained sufficient internal indicia of creditability to remove any doubt that M–K in fact received a competent opinion. What these memoranda clearly demonstrated was M–K's willful disregard for the Robley patents. The appellant clearly failed to exercise its affirmative duty. Accordingly, the district court's finding that infringement was willful, in the totality of the circumstances presented in this case, is not clearly erroneous and the district court did not abuse its discretion in awarding treble damages. Milgo, supra, at 665, 206 USPQ at 497.

### V. Conclusion

Accordingly, we affirm the district court's conclusions regarding the validity of

the patents at issue, infringement of the reissue patent, willful infringement, the amount of the damages, the trebling of the damages, and the award of prejudgment interest on the primary portion of the damage award. We reverse the award of prejudgment interest on the punitive portion of the damage award.

AFFIRMED–IN–PART; REVERSED–IN–PART.